RAY-TEK SERVICES, INC. *vs.* DAVID W. PARKER & another.[1]

No. 04-P-78.

Norfolk. February 18, 2005. - August 3, 2005.

Present: GREENBERG, DREBEN, & GREEN, JJ.

*Joint Enterprise. Contract,* Performance and breach. *Consumer Protection Act,* Availability of remedy. *Damages,* Loss of profits, Breach of fiduciary duty. *Corporation,* Corporate disregard. *Fiduciary.*

A Superior Court judge erroneously awarded the plaintiff in a civil action treble damages and attorney's fees pursuant to G. L. c. 93A, where the actions complained of were private transactions between partners in a joint venture and therefore not subject to that statute. [170-171]

In a civil action arising out of the breach of a joint venture agreement, the judge erred in awarding damages based on the joint venture's lost profits, in circumstances where such damages were too speculative and unsupported by evidence to serve as the foundation for a judgment. [171-176]

In a civil action arising out of the breach of a joint venture agreement between two companies, personal liability was appropriate for an individual defendant, where the individual, as the president of one company involved in the joint venture, owed a fiduciary duty to the other company involved in the joint venture, and where the individual personally participated in the torts giving rise to the breach. [176-178]

CIVIL ACTION commenced in the Superior Court Department on July 13, 1999.

The case was heard by *Elizabeth B. Donovan,* J., and the entry of separate and final judgment was ordered by her.

*S. Elaine McChesney* for the defendants.

*Thomas J. Chirokas* for the plaintiff.

GREENBERG, J. Mark Johnson is the principal officer and shareholder of the plaintiff, Ray-Tek Services, Inc. (Ray-Tek), which sells and services equipment for medical providers and hospitals. Johnson learned that the York Hospital (York) in Maine wanted to purchase a new cardiac cath lab, an expensive

[1]North Atlantic Imaging Systems, Inc.

piece of cardiac diagnostic equipment. Shimadzu, a cardiac cath lab manufacturer, sold this equipment in New England through North Atlantic Imaging Systems, Inc. (NAIS), an authorized dealership wholly owned by David W. Parker. Johnson began discussions with Parker. Unfortunately, the relationship between Johnson and Parker soured after they formed a joint venture in 1997. In an action brought in Superior Court in July, 1999, Ray-Tek complained that Parker and NAIS breached their joint venture agreement and committed violations of G. L. c. 93A.[2] Additional counts were brought against Parker, individually, for breach of contract, conversion, and breach of fiduciary duty. As to both defendants, Ray-Tek sought an accounting and recovery in quantum meruit.

1. *Procedural history.* After a bench trial, a Superior Court judge found for Ray-Tek on most counts, dismissing only its claims for conversion and quantum meruit. She found that Parker breached his fiduciary duty in a number of ways: by refusing to provide Ray-Tek with documentation of costs and expenses; by providing false financial information; by lying about whether he received special pricing on the machine from Shimadzu; and by lying about whether Shimadzu required Ray-Tek to sign a noncompetition agreement before receiving training to carry out its share of the service contract with York. She also held Parker personally liable for breach of the joint venture agreement. She seems to have accepted that the joint venture was between Ray-Tek and NAIS as corporations, but she concluded that the corporate veil should be pierced.

The judge also found that NAIS breached the joint venture agreement by not sharing pricing information with Ray-Tek, failing to file a timely accounting with Ray-Tek, failing to properly document the sale, and requiring Ray-Tek to sign a noncompetition agreement when it was not a condition precedent to training by Shimadzu.

Finally, the judge allowed relief against both defendants under G. L. c. 93A. She acknowledged that private grievances do not typically give rise to unfair trade or business claims, but explained that "the conduct of NAIS and David W. Parker was

---

[2]The complaint does not specify which section of c. 93A was violated, but presumably it sounds in §§ 2 and 11.

fraught with fraud, lies and deception. The conduct was wilful and knowing."

These rulings in place, the judge ordered an accounting between the parties and, pursuant to Mass.R.Civ.P. 53, as amended, 423 Mass. 1408 (1996), appointed a master to perform an accounting to determine the profit from the sale of the equipment and from the as yet unperformed eight-year service contract with York. The master determined that the net income of the joint venture from the sale of the Shimadzu equipment was $108,103.88, of which $54,051.94 was owed to Ray-Tek. He also found that the service contract was worth $400,000 over eight years and that Ray-Tek's share was $200,000. Trebling these figures (since Parker had not yet paid any of the profit from the sale to Ray-Tek), the judge entered final judgment against Parker and NAIS for $762,155.82, along with attorney's fees and costs in the amount of $29,238.55.

Parker and NAIS appeal from the judgment, arguing that it was error to apply G. L. c. 93A to this dispute, that it was error to award eight years of future profits on the service contract, and that Parker is not personally liable for damages as the joint venture was between the two corporations.

2. *Facts.* We reprise the complicated facts drawn primarily from the judge's findings below, supplemented by uncontroverted portions of the record.

Ray-Tek is a closely held New Hampshire corporation that contracts with hospitals for the sale and repair of x-ray equipment. NAIS is a closely held Massachusetts corporation, wholly owned and controlled by Parker. In 1997, NAIS was the authorized New England distributor for Shimadzu filmless cardiac cath labs.

Ray-Tek has a long-standing contract with York for servicing its x-ray equipment. Johnson, a co-owner, is well-respected by York personnel, and his wife works at York as a technician in the cardiac cath lab. In 1997, Johnson became aware that York was in the market for a new cardiac cath lab, an expensive piece of medical equipment with which Ray-Tek previously had no experience. Johnson and Ray-Tek's co-owner, Ralph Polichetti, investigated such equipment at a radiology convention in Chicago in December, 1997. Ray-Tek hoped to broker the sale

of the cardiac cath lab itself in order to secure future business servicing the equipment as well as profits from the sale. Therefore, it focused its inquiries only on those manufacturers of cardiac cath labs, like Shimadzu, that do not have their own sales and service personnel. A Shimadzu representative informed Ray-Tek that it could not serve as its broker for the sale, however, because NAIS was the exclusive independent distributor for New England. He then introduced Johnson and Polichetti to Parker; they exchanged business cards that identified their positions with their respective companies and agreed to meet again in New England.

They met in late December, 1997, or early January, 1998, at a restaurant in Woburn. According to Johnson's trial testimony, this meeting, during which the parties structured their joint venture, lasted for approximately forty-five minutes. There was no written agreement memorializing their deal. Ray-Tek had an inside track with the hospital, and NAIS had the exclusive right to distribute Shimadzu cardiac cath labs in New England. The gist of their oral agreement was that Ray-Tek and NAIS would share both the expenses and profits from the sale of a Shimadzu cardiac cath lab to York. The judge also found that at this meeting they agreed to share the service contract that would accompany the sale, with both companies providing service labor and sharing the profits. After this meeting, for at least a time, Ray-Tek seems to have believed that it alone would have the service contract, but the judge found that to be a unilateral mistake.

The two companies marketed the product to York with Ray-Tek primarily in an introductory and support role and NAIS making the technical presentations. NAIS took the lead in negotiating the actual sales and service contract with York. Because of competition from other vendors, NAIS reduced the price of the equipment to York by $130,000 and agreed that the first two years of a ten-year service contract would be warranty years that would not cost the hospital anything. Ray-Tek was concerned about the effect the price reduction would have on the joint venture's profits, and asked Parker whether he had secured special pricing on the equipment from Shimadzu. Parker claimed that he had not, which the judge found to be a lie, as

Parker had sought a reduction in the price from Shimadzu as early as March, 1998, and subsequently received special pricing. York executed the sale and service contract on April 3, 1998; installation of the equipment began on November 24, 1998, and was completed with inspection on January 18, 1999. The contract was between York and NAIS, and contained a service provision: NAIS would service the equipment for ten years; the first two years would be under warranty and in the following eight years York would pay a flat fee of $65,000 per year. The service contract also explicitly stated that either party could cancel with sixty days' written notice.

The relationship between NAIS and Ray-Tek soon fell apart. The two primary sources of tension were Parker's failure to provide Ray-Tek with reliable financial information, and the dispute over training Ray-Tek personnel to service the cardiac cath lab. As noted above, Parker told Ray-Tek that NAIS had not received special wholesale pricing from Shimadzu on the equipment. In December, 1998, Johnson became aware that there had been special pricing on the equipment and believed that Parker had lied to him. He began demanding an accounting from Parker, and the judge found that Parker never provided accurate financial information, even during discovery after litigation began.

The relationship also became frayed because of disputes about whether Ray-Tek should sign a noncompetition agreement with NAIS in order to get training to service the Shimadzu equipment. In order to perform any servicing on the cardiac cath lab, a Ray-Tek employee needed to be trained by Shimadzu in Japan. Through NAIS, Johnson was enrolled in a Shimadzu class in Japan for January or February, 1999. In January, 1999, before the class, Parker required Johnson to sign a "Non-Disclosure/Non-Compete Agreement" in order to attend the training. Among other things, it required that Johnson not reveal confidential training information, and "agree not to solicit or accept a contract and/or direct service work from York Hospital specifically for the Shimadzu Cardiac Cath Lab for 18 months after termination of any contract between [NAIS] and York Hospital or termination of employment." Parker told Johnson that both NAIS and Shimadzu required that the noncompetition

agreement be signed. (The judge later found that Parker lied about Shimadzu requiring it and that his motives were strictly to protect NAIS.) Johnson refused to sign the agreement, and Parker refused to allow Johnson to attend the Shimadzu training class. The parties apparently discussed training subsequently, but they never resolved the noncompetition impasse, and Johnson never attended training. By letter dated September 29, 2000, Shimadzu terminated NAIS as its dealer after a review of NAIS's "performance, forecasts, and future business prospects." As a result, the judge found that it then became impossible for Ray-Tek's employee to be trained during the warranty period of the service contract.

3. *Analysis.*

a. *Chapter 93A.* The judge erroneously awarded Ray-Tek treble damages and attorney's fees pursuant to G. L. c. 93A. Massachusetts courts have clearly established that transactions between partners in joint ventures are private and not subject to c. 93A. See, e.g., *Zimmerman* v. *Bogoff,* 402 Mass. 650, 662-663 (1988) (c. 93A is not applicable to transactions and disputes between parties to a joint venture and fellow shareholders in a close corporation); *Szalla* v. *Locke,* 421 Mass. 448, 452 (1995) (agreements to conduct business as a joint venture are not commercial transactions subject to c. 93A); *Newton* v. *Moffie,* 13 Mass. App. Ct. 462, 469-470 (1982) (c. 93A is inapplicable to claims between individual members of same partnership that arise from partnership business). See also *Smith & Croyle, L.L.C.* v. *Ridgewood Power Corp.,* 111 F. Supp. 2d 77, 84 (D. Mass. 2000) ("Under Massachusetts law, partners in a joint venture are precluded from asserting Chapter 93A claims against one another").

The judge found a variety of unfair and deceptive acts, such as refusing to provide documentation of costs and expenses, falsifying financial information, lying about special pricing, and lying about the necessity for a noncompetition agreement. All such actions occurred within the joint venture and therefore do not give rise to G. L. c. 93A claims. See *Szalla* v. *Locke,* 421 Mass. at 452 (whether a transaction is within the scope of a joint venture is viewed broadly, and includes negotiations before the venture was started). Since the unfair and deceptive acts oc-

curred within the scope of the joint venture, Ray-Tek's arguments about arm's-length transactions are misplaced. While it is true that a fiduciary relationship does not preclude application of c. 93A when parties conduct commercial transactions at arm's length, see, e.g., *Industrial Gen. Corp.* v. *Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995); *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 416-417 (2003), the actions here were intra-venture transactions. See *Steele* v. *Kelley*, 46 Mass. App. Ct. 712, 726 (1999).

b. *Damages awarded for the service contract.* The service contract between NAIS and York — estimated to be worth $400,000 by the master — comprised the lion's share of the damages awarded by the judge to Ray-Tek. Despite their failure to properly object to the figures the master arrived at, Parker and NAIS seek to raise the issue whether it was error for the judge to award damages based on the service contract, which was terminable by either party upon sixty days notice, and where there was evidence before the trial court that the contract had in fact been canceled before judgment entered. Ray-Tek argues that such damages are legally proper and that Parker and NAIS failed to preserve the issue for appeal.

In order to understand Ray-Tek's claim that Parker and NAIS waived any deficiencies in the service contract damage award, we recite the relevant procedural facts in some detail. After determining that Parker and NAIS breached their fiduciary and contractual obligations to Ray-Tek (and had violated c. 93A in the process), the judge decided to refer the damage issue to a master, pursuant to Mass.R.Civ.P. 53. The order of reference to the master was embedded in the judge's July 11, 2002, memorandum of decision and order. The judge instructed the master to determine:

> "(1) the gross profit to NAIS from the sale of Shimadzu equipment to York Hospital and deduct the reasonable expenses to arrive at the net income of the joint venture; . . . and, (4) the value of the service contract *for the eight years of the contract excluding the two years under warranty* less the expense or projected expense incurred by NAIS in the actual servicing of the equipment" (emphasis added).

Parker and NAIS did not file a motion to revoke or amend the order of reference. The master determined that the net income of the joint venture from the sale of the Shimadzu equipment was $108,103.88, half of which, $54,051.94, was owed to Ray-Tek. His findings on the service contract was as follows:

> "I find that the value of the service contract between North Atlantic Imaging Systems and York Hospital dated May 9, 1998 . . . [to have] a net value of $400,000.00. Since the service contract provides that it can *'be canceled by either party with 60 days['] written notice'* the $400,000 value is based on the continuation of the service contract to year 2008 without cancellation" (emphasis in original).

Accordingly, he found that Ray-Tek was entitled to one-half of the value of the contract, $200,000.

The master filed his report with the court on December 17, 2001. Parker and NAIS failed to file written motions, with notice to Ray-Tek, in accordance with Mass.R.Civ.P. 53(h)(2), which provides in relevant part, "[w]ithin 30 days after service of notice of the filing of the report or such other time as the court may allow, any party may serve written objections thereto . . . clearly stating the grounds for each objection and the relief sought."

On April 23, 2002, the judge conducted a hearing on Ray-Tek's motion to confirm the master's report. Although Parker and NAIS never properly objected to the report, their counsel, Mr. Titlebaum, made some effort to raise objections at the hearing.[3] He told the judge that the service contract "was terminable by either party upon 60 days['] written notice" and that "this is hearsay but Mr. Parker is in Court right now, did advise me that the service contract was canceled by the hospital February 1st, 2002." The judge acknowledged that if the service contract had been canceled, it might have an impact on her

---

[3]The defendants argue that the judge erred in entering judgment for Ray-Tek because they were not represented by counsel at the hearing held on April 23, 2002, on Ray-Tek's motion to confirm the master's report. Our review of the transcript of that hearing clearly indicates that Mr. Titlebaum was present at that hearing and acted on behalf of the defendants. We see no basis for the defendants' allegations to the contrary. The defendants are represented by different counsel on appeal.

judgment, but added that "I think we need an affidavit from, maybe someone at the hospital . . . [that] set forth if it was canceled, why it was canceled and what the reason for its cancellation [was]." The judge indicated that either party could get the affidavit, but after that exchange, Mr. Titlebaum spoke as if he understood it to be his obligation.

Neither Parker nor Mr. Titlebaum ever filed the requested affidavit from an employee of York. However, on April 25, 2002, Mr. Titlebaum submitted a copy of a letter dated April 12, 2002, received by NAIS from York, stating that per the service contract, York was providing NAIS with sixty days' written notice of termination of the contract retroactive to February 1, 2002. As reason for cancellation, the letter cites the fact that NAIS is no longer the authorized Shimadzu dealer/representative in the region, that NAIS informed York that a new company in New Jersey would be their contact for service, and that York had consulted with Shimadzu before deciding to switch service providers. In response, Ray-Tek filed a supplemental memorandum in support of its motion to confirm the master's report, arguing that it was still entitled to a full eight years of expected profits from the canceled service contract because the cancellation was due to Parker's wrongdoing. Although counsel for Ray-Tek argued at oral argument before this court that this memorandum was not an admission that the service contract had been canceled, the language of the memorandum seems to concede the point.

Since the master determined the value of the service contract in the course of performing an accounting, a challenge to the judgment can be viewed as a challenge to the master's findings. Were we to view it that way, we would follow the clear line of Massachusetts cases that hold defendants to have waived their right to appellate review of masters' findings unless they complied with the clear procedures for objecting to specific portions of a master's report laid out in rule 53 of the Massachusetts Rules of Civil Procedure. See, e.g., *Freitas* v. *Olson & Appleby, Inc.*, 4 Mass. App. Ct. 801, 801 (1976); *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 747 (1979) (applying the prior version of Mass.R.Civ.P. 53). See also *Kolasinski* v. *Paczkowski*, 307 Mass. 73, 76 (1940) (applying the pre-rules requirement — which

continues under the rules — that a party must properly object to specific portions of a master's report in order to preserve issue for appeal).

The atypical circumstances of this case, however, render the mistakes below nonfatal on appeal. We do not view the question here as whether the judge properly affirmed a master's report, and therefore do not hold Parker's and NAIS's failure to object to the report to constitute waiver of the entire issue.[4] The central question is whether it was proper for the judge to award damages based on the assumption that both parties to the service contract would perform the service contract for eight years. Since the judge's order to the master instructed him to determine "the value of the service contract for the eight years of the contract excluding the two years under warranty," the decision was made by the judge, not the master. Since the master did not make any findings regarding the central issue raised on appeal, we do not treat the failure to object to the master's report as waiver of the entire question, and we consider it here.

Faced with unraveling the confusion the parties created, and forced to do so where the deteriorated relationship made carrying on the venture impracticable, the judge chose to end the venture. Although there was no formal decree of dissolution, the judge's memorandum and order clearly contemplated that result, and it was within her power to do so in this situation. See G. L. c. 108A, § 32. The judge properly determined that even if the joint venture were ended, Ray-Tek was still entitled to its share of any profits NAIS continued to earn under the service contract. The service contract, after all, was property of the joint venture. A joint venturer is entitled to an accounting from former joint venturers who use joint venture property after dissolution. See, e.g., *Murray* v. *Bateman*, 315 Mass. 113, 116

---

[4]Because we do not view this appeal as an appeal from the judge's decision to confirm the master's finding, we do not confront some of the irregular features of the events below that would make finding waiver particularly harsh in this case. For example, there was evidence in the record that counsel for Parker and NAIS did not initially receive a copy of the master's report when it was issued. In addition, the letter purportedly showing that York canceled the contract was dated April 12, 2002. It would have been impossible to place this new evidence before the court within the usual thirty-day window after the master filed his report in December, 2001. See Mass.R. Civ.P. 53(h)(2).

(1943). The judge chose to give Ray-Tek its share of profits under the service contract simply by valuing it as if it would last for eight years, and ordering NAIS and Parker to pay that amount up front.

The main problem with the judge's decision is that the valuation of the service contract, based on the assumption that it would continue for eight years, is too speculative and unsupported by evidence to serve as the foundation for a judgment. Valuation of assets in a final accounting should be based on evidence that shows it "by a fair degree of certainty and accuracy." *Id.* at 115. See *Durfee* v. *Durfee & Canning, Inc.,* 323 Mass. 187, 204-205 (1948) ("To recover, the profits in question must be capable of determination as a practical matter upon evidence that proves them by a fair degree of certainty and accuracy; they cannot be recovered when remote, speculative, hypothetical and not within the realm of reasonable certainty"). In this case, where (1) the term of the service contract was for eight years, (2) the service contract had only been running for approximately six months at the time the court issued its memorandum of decision and order, and (3) the service contract was terminable by either party upon sixty days' written notice, it seems unlikely that the judge could have made a reliable prediction that it would actually last for eight years. Indeed, some of the evidence suggests otherwise. In any case, the judge did not even attempt to make findings about how long the service contract might last, and instead assumed that it was appropriate to value it for eight years.[5] The judgment was impermissibly based "upon nothing more substantial than speculation, surmise and conjecture," *Murray* v. *Bateman,* 315 Mass. at 116, and we remand to the trial court for additional findings.

The trial court should determine whether the service contract was in fact canceled effective February 1, 2002, as the letter submitted to the court after the confirmation hearing indicates.

---

[5]We do not reach the question whether a court can ever take the course the judge took of entering judgment upon a final accounting that assigns a value to an executory contract that is to remain with one party of a dissolved venture. We simply reiterate that where the valuation of such a contract falls far below the standard set out in *Murray* v. *Bateman,* 315 Mass. at 116, that figure should not form the basis of the judgment.

If so, it should determine what, if any, the actual profits were and award one-half to Ray-Tek. If the service contract has not been canceled, the court should determine profits, if any, to this point and award one-half to Ray-Tek, and then take steps to ensure that going forward Ray-Tek receives any future contract profits from NAIS, which holds the service contract in trust for the joint venture.

c. *Personal liability for Parker.* The judge properly recited the relevant factors that should have been considered when determining whether to disregard the corporate form and attach liability to Parker individually.[6] However, instead of reviewing the evidence, evaluating each factor of the analysis, and making findings of fact thereon, see and contrast *Attorney Gen.* v. *M.C. K., Inc.*, 432 Mass. 546, 555-556 (2000), the judge simply concluded that "Ray-Tek has proven some of the factors. It would be a gross inequity not to pierce the corporate veil in light of the conduct by the owner and sole shareholder of NAIS." This statement may be read to implicate one of the twelve factors, "use of the corporation in promoting fraud," *id.* at 555 n.19, but the judge did not explicitly connect it to that factor. It is also evident from the record that Parker was the sole stockholder and officer of NAIS and that he controlled its operations. The question is whether there is enough to disregard the presumptively valid corporate form.

Neither the record nor the judge's findings touch on a number of the significant criteria for piercing the corporate veil, such as confused intermingling of business activities, assets, or management; observance of corporate formalities; absence of corporate records; no payment of dividends; insolvency at the time of the litigated transactions; siphoning away of corporate assets; nonfunctioning of officers and directors; and use of the corporation by Parker for his individual benefit.

The judge even made a few findings that might be viewed as inconsistent with her decision to pierce the corporate veil. She

---

[6]The factors are discussed generally in *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 619-620 (1968), and set forth in a detailed twelve-factor list in *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991), citing *Pepsi-Cola Metropolitan Bottling Co.* v. *Checker's, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985).

found that "NAIS was the regional distributor for Shimadzu"; that when the people involved in this case were introduced "[b]usiness cards were exchanged which identified their positions with their respective companies"; and that "[c]learly the parties knew the contract was between York hospital and the corporation, NAIS, Inc., the sole distributor for the Shimadzu cardiac cath lab." The facts on the record and as found by the judge fall short of presenting a picture where "the over-all structure and operation [of NAIS] misleads . . . and [Ray-Tek could not] be quite certain with what they [were] dealing." *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 736 (1991). See *Saveall* v. *Adams*, 36 Mass. App. Ct. 349, 353-354 (1994). Massachusetts law provides the benefits of the corporate form to properly incorporated and operated business entities, and the courts should be expected to disregard that form only after a thorough assessment.

Nevertheless, personal liability for Parker is appropriate in this case because he owed fiduciary duties to Ray-Tek in his capacity as president of its joint venturer, NAIS.[7] Acting in his capacity as president of NAIS, he lied to Ray-Tek about special pricing and about whether Shimadzu required Ray-Tek to sign a noncompetition agreement, deliberately withheld financial information from Ray-Tek, and deliberately provided false financial information to Ray-Tek. Moreover, as president of NAIS, Parker personally controlled payments made by York to the joint venture, and failure to distribute Ray-Tek's share would be a breach of fiduciary duty. A breach of fiduciary duty is a tort. See *Lattuca* v. *Robsham*, 442 Mass. 205, 210 (2004), citing *Kirley* v. *Kirley*, 25 Mass. App. Ct. 651, 654 (1988). "A corporate officer is liable for a tort committed by the corporation that employs him, if he personally participated in the tort," so in "these circumstances [Parker] cannot hide behind the

[7]The complaint alleged breach of contract by Parker individually, alleging that he was personally a party to the joint venture, along with his corporation, NAIS, and Ray-Tek. The judge did not make an explicit ruling on whether Parker was personally a member of the venture. However, she apparently did not view him as such. At one point she refers to the "two groups" in the venture. More importantly, the decision does not find a breach of contract by Parker individually. Instead, it is when addressing this claim that the judge offers her conclusions about piercing the corporate veil.

corporation." *Townsends, Inc.* v. *Beaupre*, 47 Mass. App. Ct. 747, 751, 752 (1999). See *Refrigeration Discount Corp.* v. *Catino*, 330 Mass. 230, 235 (1953); *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. at 414. Therefore, Parker and NAIS, jointly and severally, must account for the profits the joint venture made on the sale of the cardiac cath lab as well as profits from the service contract.

So much of the judgment that awarded Ray-Tek damages and attorney's fees and costs against NAIS and Parker pursuant to G. L. c. 93A is reversed. We vacate that part of the judgment awarding damages against NAIS and Parker based on the service contract, and remand the matter to the Superior Court for a new determination of damages consistent with this opinion. We affirm that portion of the judgment awarding $54,051.94 against NAIS and Parker representing one-half of the net income of the joint venture from the sale of the Shimadzu equipment.

*So ordered.*